# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| LATERRAL ENGLAND, in her capacity of administrator of the ESTATE OF TERRY THURMOND, deceased; CRYSTEN JACKSON, as next of kin and natural guardian of the minor children of decedent; and NIYAH THURMOND,<br>    Plaintiffs,<br>                    v.<br><br>_____<br><br>CLAYTON COUNTY, GEORGIA; CORRECTHEALTH    CLAYTON, LLC;    MILLENIA    MEDICAL SERVICES, INC.; LEVON ALLEN, in his official capacity; DIONTE MCCAULEY, in his individual and official capacity; FRED DENSON, in his individual and official capacity; RANDY GADDY, in his individual and official capacity; DERRICK DOYLE, in his individual and official capacity; ELLONTE JOHNSON; DANILO JONES, in his individual and official capacity; TAMEIKA SMITH, in her individual and official capacity; JESSICA CASTELLANOS; PETER LONGONJE; DOES 1-10,<br><br>    Defendants. | CIVIL ACTION NO.<br> [JURY TRIAL DEMANDED] |

## COMPLAINT FOR DAMAGES

**COMES NOW,** Plaintiff Laterral England, as administrator for the estate of

Terry Thurmond, deceased, Crysten Jackson, as next of kin and natural guardian of

Mr. Thurmond's two surviving minor children, and Niyah Thurmond, Mr. Thurmond's adult daughter, by and through undersigned counsel, and hereby file their Complaint for Damages:

## INTRODUCTION

1.      This action arises out of the homicide of Terry Thurmond at the Clayton County Jail, which was proximately and/or actually caused by Defendants.

2.      Plaintiffs seek money damages pursuant to 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.

3.      Plaintiffs assert Mr. Thurmond suffered death due to excessive force, deliberate indifference to his serious medical need, medical neglect, and discrimination based on his disability.

## JURISDICTION AND VENUE

4.      This honorable Court has jurisdiction over the federal questions involved in this action pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. §§ 12133, 1983, 1988.

5.      The proper venue is the Northern District of Georgia, Atlanta Division, as all acts complained of occurred in Clayton County, Georgia.

6.      Clayton County and the Sheriff's Office of Clayton County were presented notice of Plaintiffs' claims, where applicable, within twelve months after Mr. Thurmond's death; moreover, the respective entities were provided with

sufficient information and time to resolve such claims pursuant to O.C.G.A. § 36-11-1 and all other applicable statutory provisions but failed to do so.

## PARTIES

7.      At all times relevant hereto Terry Thurmond was a citizen of the United States and a resident of the city of Hapeville, Georgia.

8.      Plaintiff Laterral England is Mr. Thurmond's sister and the appointed administrator of Terry Thurmond's estate, a true and correct copy of the Order appointing Plaintiff as executor is attached hereto as "Exhibit A."

9.      Plaintiff Crysten Jackson is the natural guardian and next of kin to Mr. Thurmond's two surviving minor children.

10.      Plaintiff Niyah Thurmond is the adult daughter of Mr. Thurmond.

11.      Defendant Clayton County, Georgia ("Clayton County" or "County") is a political subdivision of the State of Georgia, a "public entity" within the meaning of Title II of the ADA, and is subject to the jurisdiction of the Court. Defendant Clayton County owns and maintains the Clayton County Jail ("Jail") and is responsible for providing constitutionally adequate conditions for pre-trial detainees and inmates at the Jail, as well as establishing customs and policies for such purposes. Defendant Clayton County had a duty to provide for the medical care of pre-trial detainees at the Jail, including the provision of constitutionally adequate mental health services.

12.     Defendant Levon Allen ("Allen") is the Sheriff of Clayton County. Sheriff Allen is sued in his official capacity as the head of the Clayton County Sheriff's Office ("CCSO" or "Sheriff's Office"). As a constitutional officer, the Sheriff and deputies in his office, have a duty to operate the Jail in a constitutionally sound manner. Furthermore, the Jail is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1); 28 C.F.R. § 35.104, and is therefore subject to Title II of the ADA, 42 U.S.C. §§ 12131 et seq., and Georgia sheriffs and their deputies act as "arms of the state" in developing, promulgating and implementing use-of-force policies and procedures, the classification and housing of inmates, as well as the hiring and training of jailers.

13.     Defendant Ellonte Johnson ("Johnson") was a Clayton County Deputy Sheriff at all times material hereto and is being sued in his individual and official capacity.

14.     Defendant Randy Gaddy ("Gaddy") was a Clayton County Deputy Sheriff at all times material hereto and is being sued in his individual and official capacity.

15.     Defendant Dionte McCauley ("McCauley") was a Clayton County Deputy Sheriff at all times material hereto and is being sued in his individual and official capacity.

16.    Defendant Fred Denson ("Denson") was a Clayton County Deputy Sheriff at all times material hereto and is being sued in his individual and official capacity.

17.    Defendant Derrick Doyle ("Doyle") was a Clayton County Deputy Sheriff at all times material hereto and is being sued in his individual and official capacity.

18.    Defendant Danilo Jones ("Jones") was a Clayton County Deputy Sheriff at all times material hereto and is being sued in his individual and official capacity.

19.    Defendant Tameika Smith ("Smith") was a Clayton County Deputy Sheriff at all times material hereto and is being sued in her individual and official capacity

20.    Defendant Correcthealth Clayton, LLC ("CorrectHealth") is and was, at all times material hereto, a private for-profit Georgia Corporation that contracts with Defendant Clayton County to perform a traditional government function under color of state law in the Jail by providing administrative services, physician care, nursing care, emergency medical and sick-call services, medical records management, and medication management, as well as other related services, including the provision of mental health services for the Jail's mentally ill population.

21.    Defendant Millenia Medical Services, Inc. ("Millenia") is and was, at all times material hereto, a private for-profit South Carolina Corporation that contracts with Defendant Clayton County and/or Defendant CorrectHealth to perform a traditional government function in the Jail under color of state law by providing administrative services, physician care, nursing care, emergency medical and sick-call services, medical records management, and medication management, as well as other related services, including the provision of mental health services for the Jail's mentally ill population

22.    Defendant Jessica Castellanos was, at all times material hereto, a private contractor at the Jail performing a traditional government function under color of state law and is being sued for professional negligence as a nurse while acting within the course and scope of her employment or agency for Defendant Millenia and/or Defendant CorrectHealth.

23.    Defendant Peter Longonje was, at all times material hereto, a private contractor at the Jail performing a traditional government function under color of state law and is being sued for professional negligence as a nurse while acting within the course and scope of his employment or agency for Defendant Millenia and/or Defendant CorrectHealth.

24.    Plaintiff has been diligent in attempting to learn the identities of all the parties responsible for the wrongdoing herein alleged; however, Plaintiff believes

additional parties do exist that are not named due to Plaintiffs' inability to discover their identities or the extent of their involvement at this time. To that end, Does 1 through 10 are parties that have not yet been identified but who are liable for the injuries alleged in this Complaint.

## FACTUAL ALLEGATIONS

25.    Terry Thurmond was transported to Clayton County Jail from Hartsfield-Jackson International Airport after he was arrested on the concourse for trespass when he was unable to provide the date and time he arrived or how he got on the concourse.

26.    Mr. Thurmond had been detained at the Jail previously and his history of mental health issues and hypertension was known to the Sheriff's Office, and the employees and contractors at the Jail, including Defendants CorrectHealth and Millenia.

27.    At the time he was classified and processed into the Jail's population, the medical intake or screening identified Mr. Thurmond as having a mental impairment or a mental health history or issue and classified him for placement into a "mental health unit."

28.    Defendant Allen's office, who had the authority and responsibility for implementing the Jail's policy and procedures for the classification and

assignment of inmates, assigned Mr. Thurmond to Housing Unit 1, which was known to house mental health inmates.

29.    Although Mr. Thurmond was housed in a unit for those with mental health problems, he never received any medication or treatment for his mental health issues.

30.    This was true even when he began to exhibit signs of a mental health crisis and called for help from the officers and medical personnel at the Jail over an hour before the mental health episode that led to his death.

31.    When the jailers eventually responded, it was in response to various reports or calls that indicated Mr. Thurmond was experiencing significant mental impairment and exhibiting erratic behavior. An "Active 53" call came over the radio.

32.    At no point was there any report or call that indicated Mr. Thurmond was a danger to any inmate or officer.

33.    CCTV of the incident shows that Mr. Thurmond was lying on the second floor as though sleeping and leaning under the rail, while one or two other inmates held him and talked to him.

34.    Mr. Thurmond was not a danger to others and the interaction between the inmates was not violent, as inmates held on to Mr. Thurmond with minimal force and appeared to be trying to calm him down.

35.     Mr. Thurmond became noticeably more erratic and excited after the officers arrived and immediately began to pull, wrestle and beat him back from the rail, after which Mr. Thurmond stood up and became even more erratic in trying to get away or escape the officers while on the second floor.

36.     Mr. Thurmond's reaction to the officers was such that it was observably clear he was experiencing mental impairment that substantially limited his ability to rationally respond or process the use of force by the officers.

37.     It was known by the officers and personnel at the Jail that he had such impairment.

38.     Mr. Thurmond was hit with Taser shocks when he tried to escape the use of force while on the second floor, causing him to fall to the ground, after which five or six officers quickly gained control of him by placing him in the prone position and pinning his legs and arms behind his back using their hands, knees and weight to hog-tie Mr. Thurmond.

39.     Once the officers gained control of Mr. Thurmond, they remained on top of him for over twenty minutes while he lay face down with his hands and legs pinned behind his back.

40.     He died on the spot where he was taken down.

41.     The Clayton County Medical Examiner's Office (the "Medical Examiner") ruled Mr. Thurmond's death at the hands of his jailers a homicide.

42.     In the video of the incident, and as the Medical Examiner noted, the officers gained control over Mr. Thurmond around the 7:19 p.m. mark, but they continued to press down on his neck, shoulder, back and lower body until 7:36 p.m.

43.     Mr. Thurmond informed the officers that he was no longer resisting and can clearly be heard saying he quit and that he gives up.

44.     Mr. Thurmond can also be heard complaining about his breathing and losing feeling, yet the officers continued to pin him down in the prone position.

45.     Other inmates observed and signaled to the officers that Mr. Thurmond could not breathe.

46.     Georgia law enforcement officers are trained to stay off the neck when apprehending or subduing an individual.

47.     Nevertheless, at least one officer, Defendant Jones, used the knee-to-neck restraint while Mr. Thurmond was lying face down on the ground in the prone position, and maintained that position after Mr. Thurmond had expressed compliance and the difficulty he was having with breathing and loss of feeling.

48.     Another officer, Defendant Denson, stepped on Mr. Thurmond while Mr. Thurmond was physically restrained in the prone position by Defendants Jones, Gaddy, McCauley and Johnson (collectively with Defendant Denson, "Restraining Officers"), not resisting, and after his pleas for help.

49.     Mr. Thurmond was not resisting after the 7:20 pm mark on the video, and he could be seen and heard struggling to stay alive, with at least seven officers visibly in earshot when he said I quit and pleaded for help.

50.     After Mr. Thurmond pleaded for help, the Restraining Officers continued to apply pressure to Mr. Thurmond's neck, shoulder, torso, as well as his legs, while he was prone.

51.     As he lay there dying, several officers who were not restraining him observed the events without rendering aid.

52.     Defendant Smith recorded part of the response to Mr. Thurmond's mental health crisis on a phone or handheld mobile device.

53.     A nurse eventually arrived on the scene and waited nearly five minutes before checking Mr. Thurmond's breathing, and nearly six minutes before performing any chest compressions.

54.     Inexplicably, an officer kneeled on or around his neck area after the nurse arrived while the other officers continued the prone restraint with the nurse observing and Mr. Thurmond lying unresponsive face down.

55.     Defendant Jessica Castellanos, the nurse that arrived on the scene, took at least ten minutes to arrive from when she heard the call.

56.     Defendant Castellanos can be seen entering the CCTV video from Jail around the 7:33 p.m. mark, upon which she has several conversations with the

officers and stands around waiting while Mr. Thurmond lay unresponsive face down.

57.     Defendant Peter Longonje was the on-duty nurse assigned to respond to calls for medical assistance, or to the unit in which Mr. Thurmond was housed, but did not arrive to render aid until the chest compressions were already well in progress and shortly before EMTs arrived.

58.     Defendant Castellanos observed or should have observed that Mr. Thurmond was unresponsive and lying face down on the ground as soon as she entered the housing unit.

59.     When Defendant Castellanos walked up to Mr. Thurmond after stopping to talk to an officer, she did not immediately initiate CPR compressions despite observing Mr. Thurmond unresponsive and lying face down on the ground.

60.     Neither Defendant Castellanos nor any of the officers administered CPR on Mr. Thurmond until 7:39 p.m, almost six minutes after Castellanos arrived on the scene.

61.     Defendant Denson, the officer that stepped on Mr. Thurmond, performed compressions after the nurse intervened, although he never attempted to render aid when Mr. Thurmond was in obvious need prior to the nurse's arrival.

62.     By the time Defendant Castellanos applied a defibrillator to Mr. Thurmond, eight minutes had passed from the moment she arrived.

63.     Neither Defendant Castellanos or the on-duty nurse came with a portable oxygen tank, which also further delayed lifesaving medical treatment.

64.     Because Defendant Castellanos arrived without a portable oxygen tank, she had to leave the scene for over six minutes to go back and get it.

65.     The hold that killed Mr. Thurmond has been studied in multiple peer-reviewed scientific journals and by the U.S. Department of Justice, with the conclusion being that compressing an arrestee in the prone position with weight on their back and/or abdomen restricts breathing and other vital functions, and these conclusions have been widely accepted and adopted in medical and policing organizations.

66.     The United States Department of Justice has warned law enforcement for decades about the dangers of prone restraint: "The risk of positional asphyxia is compounded when an individual with predisposing factors becomes involved in a violent struggle with an officer or officers, particularly when physical restraint includes behind-the-back handcuffing combined with placing the subject in a stomach-down position." National Law Enforcement Technology Center, *Positional Asphyxia—Sudden Death* at *2 (June 1995).

67. Georgia law clearly establishes that an officer cannot use his or her knee and body weight on a non-resisting subject in the prone position.

68.  Psychiatric illnesses and high blood pressure are factors that are known to compound the risk of death for individuals restrained in the prone position.

69. Defendants Clayton County and Allen, along with other Jail personnel, had a duty to reasonably accommodate Mr. Thurmond's mental impairment.

70. Mr. Thurmond suffered from bipolar disorder, schizophrenia, and high blood pressure, and this information was known or should have been known by the officers and medical personnel at the Jail, including the nurses and medical contractors of Defendants CorrectHealth and Millenia.

71. These factors, combined with the unnecessarily long time period, made use of the prone restraint by the officers tantamount to use of deadly force against Mr. Thurmond.

72. As a result of being physically restrained in a position that significantly impaired his breathing for an extended period of time, Mr. Thurmond suffered cardiac arrest.

73. Mr. Thurmond also died because the Restraining Officers, the Observing Officers, and Defendant Castellanos failed to render aid once it was readily apparent, he was not resisting, had lost consciousness, and/or was unresponsive.

## COUNT I
## EXCESSIVE AND DEADLY FORCE
### (Restraining Officers)

74.    CCSO's Rules and Regulations define reasonable force as that minimal force needed, superior to the opposing force used by a subject, which will enable the officer to establish control over or to prevent or terminate an unlawful act.

75.    CCSO's Rules and Regulations define excessive force as force that is in excess of that reasonably required to establish control over or to prevent or terminate an unlawful act of violence.

76.    CCSO's Rules and Regulations only authorizes officers or employees to use lethal force to protect themselves or others from what is reasonably believed to be an imminent threat of death or serious bodily harm.

77.    The Restraining Officers individually and collectively used an objectively unreasonable lethal restraint in violation of Mr. Thurmond's clearly established Fourth Amendment rights by physically restraining him in a position known to cause death long after such officers had established control over Mr. Thurmond.

78.    Defendant Jones' placement of his knee to the neck of Mr. Thurmond was an objectively unreasonable use of force that violated clearly established law and caused Mr. Thurmond to suffer prior to his death and also caused his death.

79.     Defendant Denson stepped on the deceased in a manner that was objectively unreasonable and violated clearly established law and caused Mr. Thurmond to suffer prior to his death and also caused his death.

80.     The prolonged prone restraint used by the Restraining Officers long after they had established control, and long after Mr. Thurmond expressed his non-resistance was objectively unreasonable and violated clearly established law, which caused Mr. Thurmond to suffer and also caused his death.

81.     The Restraining Officers' continued use of the prone restraint after complaints he could not breathe, and after he lost consciousness, constituted an unreasonable use of force that violated clearly established law and caused Mr. Thurmond to suffer prior to his death and also caused his death.

82.     The continued use of the prone restraint by Restraining Officers for over ten minutes after he pleaded for help prevented or delayed timely medical aid and constituted an unreasonable use of force that violated clearly established law and caused Mr. Thurmond's death, and his suffering prior to death.

83.     At all times material hereto, Defendant Doyle was acting in a supervisory capacity as a Captain and directly participated in violating Mr. Thurmond's federal rights, as such Defendant is liable in his individual and supervisory capacity for the violation of Mr. Thurmond's clearly established constitutional protection from excessive force.

84.     Mr. Thurmond never presented an imminent threat of bodily or deadly harm to any Responding Officers or other inmate.

85.     A reasonable officer would have known that restraining Mr. Thurmond in the prone position for almost twenty minutes, including fifteen minutes after he pleaded for help, was objectively unreasonable and would violate clearly established Fourth Amendment rights.

86.     As such, the Responding Officers are not entitled to qualified immunity pursuant to 42 U.S.C. §1983.

87.     The Responding Officers are liable to Mr. Thurmond's estate for the pain and suffering he endured prior to his death, and to Mr. Thurmond's heirs for the full value of his life as a result of his death which was caused by a violation of clearly established constitutional protections.

88.     Plaintiff is entitled to recovery of costs, including reasonable attorney fees under 42 U.S.C. §1983.

## COUNT II
### FAILURE TO INTERVENE
### (Restraining and Observing Officers)

89.     An officer has an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers.

90.   Defendants Smith and Doyle stood on the first floor and observed, communicated with, and assisted the Restraining Officers while they restrained Mr. Thurmond in the prone position for an extended period of time, despite Mr. Thurmond being under the control of Restraining Officers and pleading for help.

91.   Defendant Denson stood over Mr. Thurmond on the second floor and observed, communicated with, and assisted the rest of the Restraining Officers while they restrained Mr. Thurmond in the prone position for an extended period of time, despite Mr. Thurmond not resisting, being under control and pleading for help.

92.   Defendant Doyle at times observed and at times physically restrained Mr. Thurmond.

93.   Defendant Denson at times observed and at times stepped on Mr. Thurmond while he was laying prone.

94.   Defendants Smith, Doyle and Denson ("Observing Officers") observed the Restraining Officers kneeling on Mr. Thurmond's neck, back, torso and legs with the full weight of their bodies for an extended period of time after Mr. Thurmond was no longer resisting, was under control, and complained about not being able to breath and losing feeling in his extremities.

95.   The Observing Officers were in a position to intervene to stop the Restraining Officers from using unnecessary and deadly force on Mr. Thurmond.

96.     Given the amount of time Mr. Thurmond was forcibly restrained while not resisting or otherwise helpless, the Observing Officers and each of the Restraining Officers had a reasonable and realistic opportunity to intervene but chose not to do so, thereby displaying deliberate indifference to Mr. Thurmond's constitutional rights.

97.     The Observing Officers and Restraining Officers failed to meet their duty to intervene to prevent the violation of Mr. Thurmond's clearly established constitutional rights under § 1983 by other officers and are civilly liable under § 1983 for such failure to intervene. *Hadley v. Gutierrez*, 526 F.3d 1324 (11th Cir. 2008); *Ensley v. Soper*, 142 F.2d 1402, 1407 (11th Cir. 1998).

98.     The individual and collective failure to intervene was a violation of Mr. Thurmond's clearly established Fourth Amendment rights.

99.     As a result of this failure to intervene, Mr. Thurmond experienced pain and suffering and lost his life.

100.    Defendant Jessica Castellanos had a duty to intervene and stop the Restraining Officers from continuing to restrain Mr. Thurmond in the prone position when she arrived because it was clear Mr. Thurmond was in need of immediate resuscitation efforts after being subjected to excessive and deadly force.

101.   Medical intervention would have been safe and reasonable under the circumstances.

102.   Defendant Jessica Castellanos chose not to intervene despite the reasonable opportunity to do so, and her failure to intervene is actionable under § 1983 because she was performing a traditional government function under color of state law.

## COUNT III
### DELIBERATE INDIFFERENCE TO MEDICAL NEED
### (Restraining and Observing Officers)

103.   The Restraining Officers and the Observing Officers failed to render aid themselves nor did they immediately seek or obtain emergency medical care for Mr. Thurmond, even after he appeared to lose consciousness and became unresponsive.

104.   The Restraining Officers and Observing Officers intentionally delayed Mr. Thurmond's access to life saving emergency medical care and treatment by continuing the use excessive force after Mr. Thurmond called for help and was not resisting, even after Mr. Thurmond became unresponsive or appeared to lose consciousness.

105.   The Restraining Officers and Observing Officers delayed and obstructed Mr. Thurmond's access to life saving medical care by intentionally

failing to call for emergency medical care, and by failing to report that Mr. Thurmond was in need of immediate resuscitation.

106.   When the nurse eventually arrived on the scene, the Restraining Officers further denied Mr. Thurmond access to immediate lifesaving emergency care and resuscitation, and intentionally delayed treatment, by continuing to physically restrain him in the prone position while he lay dying instead of allowing Mr. Thurmond to receive chest compressions, oxygen and/or defibrillation as soon as the nurse arrived.

107.   Mr. Thurmond had a right under the Fourteenth Amendment to immediate emergency care when he called for help and/or lost consciousness after being subjected to Taser deployments and restrained in the prone position for an extended period of time.

108.   The Restraining Officers and Observing Officers were aware that Mr. Thurmond needed serious medical help and delayed request for such assistance, which constitutes deliberate indifference to his serious medical need for immediate lifesaving care, in violation of his Fourteenth Amendment rights.

109.   As a result of the deliberate indifference of the Restraining Officers and Observing Officers to Mr. Thurmond's serious medical need, he experienced pain and suffering, and death.

110.   Because this disregard was more than gross negligence, the Responding Officers and Observing Officers are liable under § 1983 for their deliberate indifference to Mr. Thurmond's serious medical need.

111.   Because the response of the Restraining Officers and Observing Officers was objectively insufficient, such officers are liable under §1983 for their deliberate indifference to serious medical need.

### COUNT IV
### PRACTICE OR PATTERN OF DELIBERATE INDIFFERENCE TO MEDICAL NEED
### (Clayton County and Allen)

112.   Prior to Mr. Thurmond's death on November 28, 2022, Defendant Clayton County had knowledge of the unconstitutional policy, custom or practice of deliberate indifference to the serious medical need of inmates at the Jail.

113.   Victor Hill, the former Clayton County Sheriff, was convicted in criminal court for constitutional violations, most of which included acts or omissions that were deliberately indifferent to the serious medical need of inmates and pretrial detainees.

114.   Victor Hill established an unofficial policy or custom of projecting a tough image that equated toughness with disregard and deliberate indifference to constitutional rights, including the constitutional right to adequate care. This sort of disregard for basic rights was in line with Hill's description of the Jail as "Georgia's toughest para-military jail."

115. The officers of Jail routinely violated the constitutional rights of inmates, intentionally disregarding their serious medical needs as part of the policy or custom established by Victor Hill.

116. Five officers at the Jail used excessive force to break Melvin McDay's jaw when he was brought in as a pretrial detainee for jaywalking in December 2020, but the officers and staff at the Jail ignored his cries for medical assistance, forcing Mr. McDay to seek medical treatment on his own after he was released four days later, at which time his jaw had to be surgically repaired.

117. Gabriel Arries, who was bipolar, was deliberately denied access to critical medical care after Jail guards used excessive force with a Taser and restrained him unconstitutionally, while also beating him. They did not get him immediate medical attention after he sustained his injuries which further exacerbated the injuries, especially his brain injury. Mr. Arries was jailed for disorderly conduct in February 2021 when he experienced a mental health crisis while at the Atlanta airport as a result of missing his medication. Jail personnel knew he needed medication for his mental health emergency, but instead he was brutalized and left without access to treatment for his serious medical need.

118. Jail staff and officers knew Tiana Hill was pregnant when she was processed into the Jail, but refused her requests for prenatal care. When she went into labor, Jail officers and staff disregarded her requests to go to the hospital and

made her wait over twelve hours, and only took her to the hospital after she delivered her stillborn child.

119.   Inmates and pre-trial detainees who had suffered at the hands of their jailers were routinely denied access to medical care, as in the case of Marshall Roberson, who was punched and beaten by jailers at the Jail. When Marshall's parents went to bond him out, Jail staff told them he was no longer there without any explanation. His parents found him near a tree not far from the Jail, where he complained he was beaten up by jailers. Marshall died within three or four hours from when his parents found him near the tree.

120.   Jamie Mills requested a bottom bunk because she was not physically capable of safely reaching the top bunk. Her jailers ordered her to get on the top bunk regardless. She fell and shattered her hip trying to get on the top bunk on December 8, 2020. The jailers did not allow her to get an X-Ray for seven days despite the excruciating pain she was in in her swollen and disfigured hip area.

121.   After Victor Hill was removed from his office, the interim Sheriff did not stop the unofficial policy, custom or practice of disregarding the serious medical need of pretrial detainees at the Jail.

122.   In fact, the interim Sheriff informed inmates that "This is is still Victor Hill's jail. Nothing's changed."

123.   Allan Willison, who was severely beaten on at least two occasions, began to complain about excruciating pain in his left testicle that had swollen to the size of a tennis ball in November of 2022. He was not provided any prescription pain killers and he was not allowed to go see a urologist until January 19, 2023. Despite his urologist saying he needed to have surgery immediately, no one at the Jail responded to such calls and Mr. Willison passed away soon after.

124.   This policy, custom and practice of disregarding the serious medical needs of inmates was the moving force behind the deliberate indifference to Mr. Thurmond's serious medical need by the Restraining Officers and the Observing Officers.

125.   Mr. Thurmond's pain and suffering, as well as his subsequent death, was proximately caused by this policy, custom and practice of deliberate indifference to the serious medical needs of inmates and pretrial detainees.

126.   Defendants Clayton County and Allen have a constitutional duty not to delay or deny inmates access to medical treatment in the face of serious medical need.

127.   Prior to November 28, 2022, Defendant Clayton County and Allen adopted the policy, custom and practice of intentionally delaying or denying inmates access to medical treatment, especially for injuries sustained at the hands of officers or jailers.

128.   Because these violations reflected a policy, custom or practice, Defendant Clayton County is liable under §1983.

129.   Plaintiff is also entitled to recovery of costs, including reasonable attorney's fees under §1988.

## COUNT V
## DELIBERATE INDIFFERENCE TO MEDICAL NEED
### (Castellanos, Longonje, CorrectHealth and Millenia)

130.   Defendant CorrectHealth is a private entity that contracts with Clayton County to perform a traditionally governmental function of providing health care to inmates and pretrial detainees at the Jail, which includes medical screenings, reviewing medical and mental health history, conducting behavioral observations, and providing emergent care and/or crisis intervention, as well as providing necessary medications or referrals.

131.   Defendant Millenia is a private entity that contracts with Defendant Clayton County or Defendant CorrectHealth to perform a traditionally governmental function of providing health care to inmates and pretrial detainees at the Jail, which includes medical screenings, reviewing medical and mental health history, conducting behavioral observations, and providing emergent care and/or crisis intervention, as well as providing necessary medications or referrals.

132.    Defendants CorrectHealth and Millenia, as well as their employees, agents or contractors, have a duty to provide constitutionally adequate medical care to the inmates at the Jail.

133.    Defendant Castellanos was an employee, agent or contractor for Defendant CorrectHealth or Defendant Millenia, and arrived on scene in response to the call for medical assistance without any medical equipment.

134.    Defendant Castellanos was at all times acting within the course and scope of her employment when she delayed medical assistance to Mr. Thurmond by her inadequate response time, and her subsequent disregard for the need to begin assessing and resuscitating Mr. Thurmond immediately upon arrival.

135.    Defendant Longonje, the on-duty nurse that evening, heard the call but did not arrive to provide medical assistance to Mr. Thurmond for over twenty minutes and thereby failed to respond for all practical purposes.

136.    As a Licensed Practical Nurse, Defendant Castellanos knew that Mr. Thurmond's life was in danger but disregarded that risk because of the custom or practice of delaying or denying emergency medical care to inmates, especially for inmates seriously injured by the Jail's guards or personnel.

137.    Defendant Castellanos is liable for violations of §1983 for her deliberate indifference to the serious medical need of Mr. Thurmond for her acts and omissions under color of state law.

138.   Defendant Longonje is liable for violations of §1983 for his deliberate indifference to the serious medical need of Mr. Thurmond under color of state law.

139.   Defendants CorrectHealth and Millenia are liable under §1983 for policies or customs that caused Mr. Thurmond's injuries in violation of the Fourteenth Amendment.

140.   Defendants CorrectHealth and Millenia, along with their agents, employees, or contractors, have primary responsibility for the medical care of inmates or pretrial detainees at the Jail, such that officers and other Jail personnel defer to Defendant CorrecHealth on questions of medical care, including medication management, mental health assessments, and determinations about the necessity of emergency medical care.

141.   Despite their contractual and constitutional obligations, Defendants CorrectHealth and Millenia had a policy, custom or practice of unreasonably delaying or completely failing to provide medical care to inmates at the Jail, especially when it came to emergency medical care necessitated by the unconstitutional violations of officers and personnel at the Jail.

142.   Despite their contractual and constitutional obligations, Defendants CorrectHealth and Millenia had a policy, custom or practice of unreasonably delaying or denying inmates with serious medical needs, access to treatment at a

hospital, or outside emergency medical services, especially when it came to inmates who needed to be hospitalized or admitted as a result of injuries sustained from excessive force or other unconstitutional acts or omissions of Jail officers or personnel.

143.   These policies, customs or practice of delaying or denying emergency medical assistance to inmates were widespread and routine.

144.   They were also intentional, willing and the moving force behind the deliberate indifference to Mr. Thurmond's serious medical need on November 28, 2022, which was brought on by the unconstitutional acts and omissions of the Jail's officers and personnel.

145.   Despite knowledge or notice of such custom or practice, Defendants CorrectHealth and Millenia tacitly authorized its employees, agents or contractors to unconstitutionally delay or deny emergency medical care by not hiring, training or supervising its employees and agents to provide emergency medical care in the Jail or send inmates to the hospital, and by not reporting, disciplining, or terminating employees, agents or contractors that delayed or denied emergency medical care.

146.   Mr. Thurmond's pain and suffering, as well as his subsequent death, was directly and proximately caused by Defendant CorretHealth's and Defendant

Millenia's policy, custom and practice of deliberate indifference to the serious medical need of pretrial detainees and inmates.

## COUNT VI
## DELIBERATE INDIFFERENCE TO MENTAL HEALTH CRISIS
### (Clayton County, Allen, CorrectHealth, and Millenia)

147.   Defendant Clayton County has a constitutional duty to provide constitutionally adequate medical care to pretrial detainees under the Fourteenth Amendment, which includes the duty to provide adequate mental health care.

148.   Defendants CorrectHealth and Millenia, and their employees, agents or contractors, have the primary responsibility for the care and treatment of inmates who present a danger to themselves, which includes an initial medical assessment regarding any mental health diagnosis, monitoring their behavior for signs of mental impairment, and administering or prescribing medications as necessary.

149.   Defendants CorrectHealth and Millenia, and their employees, agents or contractors were responsible for performing mental health crisis interventions, and ensuring that a physician was present or on call twenty-four hours a day for emergency medical or mental health care, as well as having a mental health specialist on staff for crisis intervention.

150.   Defendants Clayton County, Allen, CorrectHealth and Millenia knew that Mr. Thurmond had serious mental impairment when he was processed into the Jail, and needed either immediate mental health referral, medication or crisis intervention.

151.   Defendants Clayton County, Allen, CorrectHealth and Millenia knew that Mr. Thurmond was actively suffering a serious mental health crisis based on calls for help from Mr. Thurmond and other inmates that warranted an immediate mental health referral, medication or crisis intervention.

152.   Despite knowledge that Mr. Thurmond was actively suffering a serious mental health crisis, Defendants Clayton County, Allen, CorrectHealth and Millenia failed to make an immediate mental health referral, administer the proper medication, or provide any mental health crisis intervention to reduce the risk of self-harm and the unnecessary use of deadly force on Mr. Thurmond.

153.   Mr. Thurmond's death arose after officers responded to reported attempts to harm himself or erratic behavior as result of a mental health crisis aggravated by not having his medication or other adequate medical or mental health accommodations or treatment.

154.   These failures were a part of pattern or practice of disregarding the mental health needs of inmates or pretrial detainees at the Jail by Defendants Clayton County, Allen, CorrectHealth and Millenia.

155.   Defendants Clayton County, Allen, CorrectHealth and Millenia had notice of this pattern or practice of deliberate indifference to the serious need of pretrial detainees for immediate mental health referrals, prescriptions or adequate crisis intervention.

156.   As a direct and proximate result of the deliberate indifference of Defendants Clayton County, Allen, CorrectHealth and Millenia, to the serious mental health crisis needs of Mr. Thurmond, he was met with deadly force.

157.   This custom or practice was the moving force behind the actions or omissions of the employees, agents or contractors of Defendants Clayton County, Allen, CorrectHealth and Millenia, who were all deliberately indifferent to the mental health needs of Mr. Thurmond and such indifference foreseeably resulted in Mr. Thurmond's mental health crisis and his deadly encounter with the Restraining Officers.

158.   As such, Defendants Clayton County, Allen, CorrectHealth and Millenia and Defendant CorrectHealth are liable under § 1983 for violating Mr. Thurmond's Fourteenth Amendment rights.

159.   Defendant Clayton County continued to retain, hire, approve, ratify and rely upon Defendants CorrecthHealth and Millenia, and their employees, agents and contractors, to provide adequate mental health care to inmates or pretrial detainees experiencing mental health crises despite the pattern and practice of inadequate care to such individuals.

160.   Defendant Clayton County violated Mr. Thurmond's Fourteenth Amendment rights by its ratification of the pattern and practice of blatant disregard for the serious mental health needs of inmates and pretrial detainees at

the Jail by private contractors, as well as staff or personnel acting in their role as Clayton County employees, officers or jailers.

161.   Defendant Clayton County's ratification of this pattern and practice was the moving force behind the deliberate indifference to Mr. Thurmond's serious mental health need by private contractors and officers.

162.   As a proximate result of Defendant Clayton County's ratification of a pattern and practice of disregard, Mr. Thurmond experienced suffering and death.

## <u>COUNT VII</u>
## UNCONSTITUIONAL VIOLATIONS OF ADA
### (Allen and Restraining Officers)

163.   Defendant Allen and the deputies of his office act as arms of the state in setting use of force policies, and when exercising the power to fire and hire deputies.

164.   The Jail is a public entity pursuant to 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

165.   The State of Georgia is liable for money damages caused by unconstitutional violations of the Americans with Disabilities Act ("ADA") by Defendant Allen and the deputies under his office. *United States v. Georgia*, 546 U.S. 151, 155-160 (2006).

166.   Mr. Thurmond was an individual with a disability within the meaning of Title II of the ADA because he suffered from a mental impairment that, without

the proper medication or treatment, substantially limited or restricted one or more of his major life activities.

167.   Mr. Thurmond was qualified to receive accommodations and mental health services or medications, to ensure effective communication with other inmates and Jail personnel and staff despite his mental impairment, as well as to prevent him from posing a threat to himself.

168.   As an arm of the State of Georgia, the deputies and jailers controlled where Mr. Thurmond was housed and what mental health or medical services he received.

169.   Mr. Thurmond was denied the benefits and services that would have allowed him to function and take care of himself in Jail by reason of his disability.

170.   This denial of services was not because providing such services or medication would have caused an undue burden or fundamentally altered the nature of the services provided at the Jail, but because accommodation of Mr. Thurmond's mental illness was not in-line with the policy and practice of making the Jail Georgia's toughest para-military jail.

171.   Mr. Thurmond was placed in a medical unit or infirmary although he was not actually provided any mental health care for his mental impairment during or before his mental health crisis, despite the aforementioned knowledge and calls for crisis intervention.

172.   Mr. Thurmond was otherwise discriminated against due to his disability by the Restraining Officers, who used excessive force because Mr. Thurmond had a mental health episode and not because of any legitimate need to subdue or control Mr. Thurmond, as the Restraining Officers punitively restrained Mr. Thurmond in the prone position for nearly twenty minutes after he stopped resisting and was under their control, using the type of force that was in-line with the announced policy of being a para-military jail.

173.   As a result of these unconstitutional violations of the ADA, Mr. Thurmond died an excruciating death.

174.   These violations of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations, by officers acting as arms of the State of Georgia were unconstitutional as described herein, and Plaintiffs are entitled to money damages pursuant to 42 U.S.C. § 12131 et seq.

## COUNT VIII
### PROFESSIONAL NEGLIGENCE
### (Castellanos and Longonje)

175.   Pursuant to O.C.G.A. § 9-11-9.1, Plaintiffs attach as "Exhibit B," an Affidavit setting forth the qualifications of the person signing the document, and at least one act of negligence committed by Defendant Castellanos, and any other nurse or medical personnel responsible for the acts and omissions identified in the Affidavit.

176.   Defendant Castellanos delayed life saving care, arrived inadequately prepared to care for Mr. Thurmond, and failed to take primary responsibility for the medical care of Mr. Thurmond despite observing him lying face down on the ground while unresponsive.

177.   Defendants Castellanos and Peter Longonje, and any other employee, agent or contractor of Defendants CorrectHealth or Millenia responsible for the acts and omissions identified in the Affidavit, failed to exercise the required degree of care and skill in the care and treatment of Mr. Thurmond, particularly in the response to his mental health crisis, including but not limited to the failure to timely respond with the required care and skill and with the necessary medical equipment.

178.   Defendants Castellanos and Longonje failed to exercise the reasonable degree of care and skill ordinarily employed by nurses under similar conditions and like circumstances.

179.   Defendant Does responsible for the acts and omissions identified in the Affidavit failed to exercise the reasonable degree of care and skill ordinarily employed by nurses, clinical supervisors, mental health professionals, or medical assistants, under similar conditions and like circumstances.

180.   As a direct and proximate result of the delayed response, and the negligence of Defendant Castellanos upon arrival, Mr. Thurmond suffered pain and succumbed to fatal injuries inflicted on him by the Restraining Officers.

181.   As a direct and proximate result of the failure to respond or the negligence of Defendant Longonje and Defendant Does, who were employees, agents, or contractors of Defendants CorrectHealth or Millenia, Mr. Thurmond suffered pain and succumbed to fatal injuries inflicted on him by the Restraining Officers.

## COUNT IX
## VICARIOUS LIABILITY
### (CorrectHealth and Millenia)

182.   At all times material herein, Defendant Castellanos, Defendant Longonje, and Defendant Does were employees, agents or contractors of Defendants CorrectHealth or Defendant Millenia (collectively, "Private Contractors"), and were acting within the course and scope of their employment, agency or contract.

183.   At all times material herein, Defendants Castellanos and Longonje were employees or agents of Private Contractors, who entered into a contract by and between Defendant Clayton County or each other, to provide medical care, mental health services, and nursing services to inmates or pretrial detainees at the Jail with, at minimum, the degree of care and skill required under O.C.G.A. § 51-1-27.

184.   Private Contractors, individually or collectively, are vicariously liable for the negligent acts and omissions of Defendants Castellanos and Longonje that were committed in the course and scope of their employment, agency or contract.

185.   Private Contractors, individually or collectively, are vicariously liable for the negligent acts and omissions of Defendant Does that were committed in the course and scope of their employment, agency or contract.

186.   Private Contractors are vicariously liable for the pre-death injuries and suffering of Mr. Thurmond, as well as the death suffered by Mr. Thurmond, due to the negligence of Defendants Castellanos and Longonje, and any other employees, agents or contractors responsible for the acts and omissions identified in the Affidavit.

## COUNT X
## NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION
### (CorrectHealth and Millenia)

187.   Defendant CorrectHealth negligently hired and retained Defendant Millenia to provide medical care and skilled services to inmates and pretrial detainees at the Jail despite knowledge of Defendant Millenia's record of hiring and retaining unqualified and untrained nurses, or its track record of not providing the appropriate number and level of medical staff to the Jail.

188.   Defendant CorrectHealth negligently failed to maintain policies, procedures and budgets, for its employees and contractors, that would provide

for adequate medical care and mental health services to be provided to inmates and pretrial detainees with mental illnesses.

189.   Private Contractors negligently failed to properly train and supervise employees, agents and contractors, including Defendants Castellanos and Longonje, to provide pretrial detainees like Mr. Thurmond with appropriate care, but retained such nurses, medical assistants, or mental health professionals even though they were not properly trained.

190.   As a direct and proximate result of the negligent hiring, training and supervision by Private Contractors, individually and collectively, Mr. Thurmond suffered and experienced death.

## <u>COUNT XI</u>
## PUNITIVE DAMAGES AND ATTORNEY FEES

191.   The acts and omissions of Defendants described herein constitute willful misconduct, malice, oppression, and an entire want of care, and caused Mr. Thurmond's suffering and death, such that Plaintiffs are entitled to punitive damages under state and federal laws.

192.   Plaintiffs are also entitled to recovery of costs, including reasonable attorney's fees, under 42 U.S.C. § 1988 for constitutional claims.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for trial before a jury and judgment against

Defendants as follows:

a) That Plaintiffs recover all general, special, compensatory, derivative and
   punitive damages as well as costs, including reasonable attorneys' fees under
   42 U.S.C. § 1988 and prejudgment interest.

b) That Plaintiffs recover for the expenses of litigation, including for reasonable
   attorney's fees and costs pursuant to O.C.G.A. § 13-6-11;

c) That all issues be tried before a jury; and

d) For such other and further relief as this Court deems just and proper.

This 28th day of November, 2023.

**REYNOLDS LAW GROUP, LLC**

By:   /s/ *Isaac Tekie*
      Isaac Tekie
      GA Bar No. 558190
Thomas E. Reynolds, Jr.
      GA Bar No. 778864

*Attorneys for Plaintiffs*

3390 Peachtree Road, N.E., Ste. 1100
The Lenox Towers
Atlanta, Georgia 30326
888.665.0241 (T)
888.677.1453 (F)

EXHIBIT "A"

## IN THE PROBATE COURT OF <u>FULTON</u> COUNTY
## STATE OF GEORGIA

IN RE:  ESTATE OF                                     )
                                                      )
<u>Terry Lee Thurmond</u>                             )        ESTATE NO. <u>PC-2023-1016</u>
DECEASED                                              )

### LETTERS OF ADMINISTRATION
(Bond waived and/or certain powers granted)

At a regular term of Probate Court, this Court granted an order allowing  **<u>Lateral England</u>** to qualify as administrator(s) of the above-named decedent, who was domiciled in this county at the time of his or her death or was domiciled in another state but owned property in this County at the time of his or her death, and that upon so doing, letter of administration be issued to such personal representative(s).

THEREFORE, the said administrator(s), having taken the oath of office and complied with all necessary prerequisites of the law, is/are legally authorized to discharge all the duties and exercise all powers of personal representative(s), according to Georgia law. In addition this Court:
[Initial all that apply]

<u>X</u>(a)        ***POWERS GRANTED:*** Grants to the administrator(s) all of the powers contained in O.C.G.A. §53-12-261, except the administrator(s) shall not be authorized to bind the estate by any warranty in any conveyance or contract in violation of O.C.G.A.§53-8-14 (a)

<u>X</u>(b)        ***REPORTS WAIVED:***  Grants to the administrator(s) the specific power to serve without making and filing inventory, and without filing any annual or other returns or reports to any court.

<u>X</u>(c)        ***BOND WAIVED:***  Waives the specific requirement to post bond.

~~(d)        STATEMENTS WAIVED:  Grants to the administrator(s) the specific power to serve without furnishing to the heirs statement for receipts and disbursements.~~

IN TESTIMONY WHEREOF, I have hereunto affixed my signature as judge of the probate court of said county and the seal of this office this <u>4th</u> day of __<u>August</u>__ , 20<u>23</u>.

Kenya M. Johnson
Kenya M. Johnson
Judge of the Fulton County Probate Court

NOTE:  The following must be signed if the judge
            does not sign the original of this document:

Issued by:

Clerk of the Probate Court

(Seal)

## INSTRUCTIONS

1. Unless inventory has been waived, an inventory of the estate must be filed with this Court by the administrator within six months after these letters are issued and a copy of that inventory must be delivered to the sui juris heirs by First-Class mail within the same period.

2. Within 60 days after these letters are issued, notice must be given once a week for four weeks by advertisement in the official newspaper in this county in which the petition is made, requiring creditors of the estate to render in their demands and requiring debtors to make payment.

3. Unless returns have been waived, or a different accounting period has been approved, within 60 days after the anniversary date of issuance of these letters, in each and every year, every administrator must make a just and true account, under oath, of his or her receipts and expenditures on behalf of the estate during the preceding year, together with a note or memorandum of any other fact necessary to the exhibition of the true condition of the estate. The vouchers showing the correctness of each item must be retained by the administrator. A copy of each such return must be delivered to the sui juris heirs by First-Class within the same period. The administrator is allowed six months from the date of his or her qualification to ascertain the condition of the estate, during which he or she is exempt from suit. The administrator should collect all debts due the estate, and pay the debts of the estate, wholly or in part, at the end of the six-month period. Payment of the debts of the decedent shall be made in accordance with their rank in priority as provided in O.C.G.A.§53-7-40.

4. Unless returns and statements have been waived, at least once in each and every year, every administrator must prepare a statement of his or her receipts and expenditures on behalf of the estate during the preceding year, and a copy of each such statement must be delivered to the sui juris heirs by First-Class Mail within the same period.

5. The Administrator may continue the business of the decedent for the current year without a court order.

6. The normal commissions allowed the administrator are two and one-half percent of all sums of money received, and a like commission on all sums of money paid out. In addition, upon petition, the judge of the probate court may allow a commission of up to three percent of the value of all property distributed in kind. There are special rules concerning commissions on interest earned and extra compensation.

7. After the payment of all expenses of administration and other debts, the balance of the estate shall be promptly distributed to the heirs. The administrator must then make a final return, showing the receipts and disbursements since the last annual accounting, unless returns have been waived. A copy of the final return must be delivered to the sui juris heirs by First-Class Mail at the time of filing same.

8. It shall not be necessary for the administrator to mail copies of any annual returns or the final return, or any statements of receipts and disbursements to any heir who has individually waived in writing the right to receive copies of same unless and until such waiver is revoked in writing.

9. For further information, see O.C.G.A. Title 53, Chapters 6 & 7.

**IN THE PROBATE COURT OF <u>FULTON</u> COUNTY**
**STATE OF GEORGIA**

AUG U 4 2023

CLERK, PROBATE (

| | | |
|---|---|---|
| IN RE: ESTATE OF | ) | |
| | ) | |
| <u>Terry Lee Thurmond</u> | ) | ESTATE NO. <u>PC-2023-1016</u> |
| DECEASED | ) | |

**ORDER APPOINTING ADMINISTRATOR**

A petition for letters of administration for the above named decedent was filed.

**<u>Lateral England</u>** was nominated Administrator in the petition and is hereby found to be legally qualified for said office. The Court finds that the decedent died domiciled within, or domiciled outside the State of Georgia but owning property within, the above County. The Court finds that the decedent died intestate. The Court further finds that all of the heirs at law were served or acknowledged service. The Court further finds that no objection has been filed, and all requirements of law have been fulfilled.

ACCORDINGLY, IT IS ORDERED that the person named above is found to be qualified for such office and is hereby, appointed administrator of the estate of the decedent, and that appropriate letters be issued upon said administrator giving bond with approved surety in the sum of $<u>0.00</u> and taking the oath as provided by law. The administrator shall not make any distribution to a person for the benefit of a minor unless that person is qualified to receive such funds according to law.

IT IS FURTHER ORDERED that upon unanimous consent and publication of notice as necessary, the Court hereby: (*Initial all that apply.*)

<u>X</u> (a)    ***POWERS GRANTED***:  Grants to the Administrator all of the powers contained in O.C.G.A. § 53-12-261, except the administrator shall not be authorized to bind the estate by any warranty in any conveyance or contract in violation of O.C.G.A. §53-8-14 (a).

<u>X</u> (b)    ***REPORTS WAIVED***: Grants to the administrator the specific power to serve without making and filing inventory, and without filing any annual or other returns or reports to any court;

<u>X</u> (c)    ***BOND WAIVED***: Waives the specific requirement to post bond.

___ (d)    ~~***STATEMENTS WAIVED:*** Grants to the administrator the specific power to serve without furnishing to the heirs statements of receipts and disbursements.~~

SO ORDERED this <u>4th</u> day of <u>**August**</u>, 2023.

*Kenya M. Yll*
Judge of the Probate Court

ꪂ0000000

GPCSF 3

Eff. July 2021

**EXHIBIT "B"**

AFFIDAVIT

My name is Annette Elliott-Sullivan and I am a Professional Registered Nurse. I currently serve as Telemetry Interim Nurse Manager at Kaiser Permanente Hospital in Walnut Creek California where I supervise 39 registered nurses with at least seventeen patients under my care.

I received a Bachelor of Science degree in nursing from Columbus State University and my Masters of Science in Nursing Administration from the University of Alabama, Huntsville. I maintain nursing licenses in good standing in both Georgia and California. In addition still maintain an eNLC RN license in good standing in the state of Georgia. I maintain a certification in Advance Cardiovascular Life Support with the American Heart Association.

In 2014 began practical correctional nursing experience as a medical/surgical unit nurse extern at the Atlanta Medical Center in Atlanta, Georgia where I provided patient care under the supervision of a registered nurse in the correctional unit. In 2019 I became the Director of Nursing for WellPath, the medical healthcare provider servicing Gwinnett County Jail in Lawrenceville, Georgia. In addition to overseeing day to day clinical operations of the 50-bed infirmary unit, I also hired, trained, assigned, supervised and evaluated nursing personnel work performance to ensure compliance with all facility and regulatory agency standards, policies and procedures. My direct reports included 55 nurses (RNs and LPNs), 3 clinical supervisors and 10 medical assistants. While serving at the Gwinnett County Jail I coached team members on policies and procedures thereby cutting employee reprimands and terminations by 20%.

In 2020 I served as Health Services Administrator for Naphcare, the healthcare service provider for Fulton County Jail in Atlanta, Georgia. In that role I planned, directed, coordinated and supervised the delivery of healthcare to the facility. My direct reports included 250 nurses, 10 clinical supervisors, 5 clinical directors, 24 mental health professionals, and 20 medical assistants. During my tenure I assisted  Fulton County Jail in obtaining a National Commission on Correctional Healthcare accreditation.

I have reviewed video footage and the time line obtained in the Clayton County Coroner's report of Mr. Terry Lee Thurmond III (DOB: 7-25-84) and the circumstances leading to his death. I conclude that the medical care provided to Mr. Thurmond on the relevant dates in question while detained in the Clayton County Jail under the care of CorrectHealth staff persons fell below the reasonably skilled and competent standard of care for licensed practical nurses or (LPNs). I base my conclusion on the following:

(1) The LPN took 5 mins 51 seconds to initiate CPR compressions after arriving at the housing unit, significantly delaying early and high-quality cardiopulmonary resuscitation (CPR). A quicker initiation of CPR could likely have saved Mr. Thurmond's life; (2) The LPN took 8 minutes 10 seconds after arriving in the housing unit to apply AED pads to the detainee missing the opportunity for rapid defibrillation, a critical step in the Chain of Survival; (3) The LPN appeared to have lacked a sense of urgency upon arriving in the housing unit resulting in a delay before taking life-saving action. Those delays were likely critical and failure to act with urgency played a role in the failed lifesaving attempts; (4) The LPN did not have all the necessary life-saving equipment present for a code blue medical emergency, which hampers the ability to provide immediate and effective interventions. The LPN left the unit for over 6 minutes to return with a portable tank of oxygen. This failure prevented the LPN from having the necessary lifesaving

intervention tools and likely decreased Mr. Thurmond's chances of survival; (5) The CPR compressions delivered by the officers were noted to be inadequate, with some compressions being shallow and out of cadence, potentially affecting the effectiveness of the CPR procedure. Compressions should have been 2 to 2.4 inches into the chest at a rate of 100 to 120 compressions per minute. Overall, the observed deficiencies indicate a failure to meet the recommended nursing response for cardiac arrest, and the deficiency likely negatively impacted Mr. Thurmond's chances of survival.

For the foregoing reasons, it is my professional opinion that the treatment that Mr. Thurmond received from CorrectHealth and its employees/agents during his detention at Clayton County Jail during the November 27, 2022 medical emergency was professionally negligent, and did not meet the reasonably skilled and competent standard of care applied to LPNs.

Further, Affiant sayeth Not.

Annette Elliott-Sullivan MSN, RN

I, the undersigned Notary Public, in and for said State and County, hereby certify that Annette Elliott-Sullivan, whose name is signed to the foregoing Affidavit, and who is known to me, acknowledged before me on this day that, being informed of the contents of said Affidavit, he executed same voluntarily on the day the same bears date.

Given under my hand and seal this __21__ day of __August__, 20_23_.

_____

Notary Public

My Commission Expires: _April 13, 2027_

SEE
ATTACHED

# CALIFORNIA NOTARY ACKNOWLEDGMENT

> **A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.**

State of <u>California</u>

County of <u>Los Angeles</u>

On <u>August 21</u>, 20<u>23</u> before me, **Alexandria Ortiz / Notary Public**,

personally appeared <u>Annette Elliott-Sullivan</u>

_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



ALEXANDRIA ORTIZ
Notary Public - California
Los Angeles County
Commission # 2444166
My Comm. Expires Apr 13, 2027

Signature _Alexandria Ortiz_    (Seal)